# In the United States Court of Federal Claims

BID PROTEST
No. 20-1078C
Filed Under Seal: March 1, 2021
Reissued: March 30, 2021*

|  |  |  |
|---|---|---|
| XTEC, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Post-Award Bid Protest; Judgment Upon |
| v. | ) | the Administrative Record, RCFC 52.1; |
| | ) | RCFC 12(b)(1), Subject-Matter |
| THE UNITED STATES, | ) | Jurisdiction; Motion To Supplement The |
| | ) | Administrative Record; Best Value. |
| Defendant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GUIDEHOUSE LLP, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |
| | ) | |

*David S. Cohen*, Counsel of Record, *John J. O'Brien*, Of Counsel, Cordatis, LLP, Arlington, VA, for plaintiff.

*Andrew J. Hunter*, Trial Attorney, *Eric P. Bruskin*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, *Jeffrey B. Clark*, Acting Assistant Attorney General, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC; *John W. Cox*, Of Counsel, United States Department of State, for defendant.

*Brian G. Walsh*, Counsel of Record, *Tracye Winfrey Howard*, Of Counsel, *Moshe B. Broder*, Of Counsel, *Sarah B. Hansen*, Of Counsel, *Nicole E. Giles*, Of Counsel, Wiley Rein, LLP, Washington, DC, for defendant-intervenor.

---

* This Memorandum Opinion and Order was originally filed under seal on March 1, 2021. ECF No. 71. The parties were given an opportunity to advise the Court of their views with respect to what information, if any, should be redacted from the Memorandum Opinion and Order. On March 30, 2021, the government filed a joint status report on behalf of the parties indicating that no redactions are necessary. ECF No. 73. And so, the Court is reissuing its Memorandum Opinion and Order, dated March 30, 2021, as the public opinion.

<u>**MEMORANDUM OPINION AND ORDER**</u>

<u>GRIGGSBY, Judge</u>

## I.      INTRODUCTION

Plaintiff, XTec, Inc. ("XTec"), brings this post-award bid protest action challenging the United States Department of State's ("State Department") evaluation process and decision to award an indefinite-delivery, indefinite quantity contract for identity and credential management products and services (the "IDMS Contract") to Guidehouse, LLP ("Guidehouse").  The parties have filed cross-motions for judgment upon the administrative record, pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC").  *See generally* Pl. Mot.; Def. Mot.; Def.-Int. Mot.  The government and Guidehouse have also moved to dismiss XTec's claim regarding the issuance of a post-award task order to Guidehouse for lack of subject-matter jurisdiction, pursuant to the Federal Acquisition Streamlining Act and RCFC 12(b)(1).  Def. Mot. at 20-23; Def.-Int. Mot. at 13-19.

In addition, XTec has moved for a preliminary injunction and for a temporary restraining order seeking to, among other things, enjoin the State Department from continuing with the performance of the IDMS Contract, pursuant to RCFC 65.  *See generally* Pl. Mot. for TRO; Pl. Mot. for PI.  Finally, XTec has also moved to supplement the administrative record with the Declaration of Samantha East.  *See generally* Pl. Mot. to Supp.

For the reasons set forth below, the Court:  (1) **DENIES** XTec's motion to supplement the administrative record; (2) **GRANTS** the government's and Guidehouse's partial motions to dismiss; (3) **DENIES** XTec's motion for judgment upon the administrative record; (4) **GRANTS** the government's and Guidehouse's respective cross-motion for judgment upon the administrative record; (5) **DENIES** XTec's motions for a temporary restraining order and for a preliminary injunction; and (6) **DISMISSES** the complaint.

## II.    FACTUAL AND PROCEDURAL BACKGROUND[1]

### A.    Factual Background

This bid protest dispute involves a challenge to the State Department's evaluation process and decision to award the IDMS Contract to Guidehouse.  The contract at issue was awarded pursuant to the State Department's Solicitation No. 19AQMM19R0302 (the "Solicitation"). Compl. at ¶ 5; *see generally* AR Tab 2; AR Tab 16; AR Tab 22.  XTec is an unsuccessful offeror in connection with that procurement.  Compl. at ¶ 1.

As background, the State Department's Bureau of Diplomatic Security is responsible for overseeing department-wide identification systems that are designed to keep the identities and credentials of agency employees and contractors secure.  AR Tab 1 at 2.  The State Department's current identification system is called One Badge, which is an identity management system and credential management system solution that uses, among other things, personal identity verification ("PIV") cards to control access to agency facilities.  *Id.*; AR Tab 2 at 26.  XTec is the incumbent provider of IDMS products and services to the State Department.  AR Tab 6 at 272.

#### 1.    The Solicitation

On July 2, 2019, the State Department issued the Solicitation to procure continued IDMS products and services to support the One Badge system.  AR Tab 2 at 118.  The Solicitation provides that the awardee "shall provide all labor, hardware, software, interfaces, cards, consumables, and services necessary to provide the [State] Department with an end-to-end identity and credential management solution."  AR Tab 16 at 453.  The Solicitation also provides that the State Department will consider the following criteria during a multi-phase evaluation process:

**<u>PHASE I:</u>**
- Factor 1:  Performance Confidence Assessment
  - Subfactor 1:  Relevant Experience
  - Subfactor 2:  Past Performance

---

[1] The facts recited in this Memorandum Opinion and Order are taken from the administrative record ("AR"); XTec's motion for judgment upon the administrative record ("Pl. Mem."); and the government's and Guidehouse's partial motions to dismiss and cross-motions for judgment upon the administrative record ("Def. Mot."; "Def.-Int. Mot.").  Except where otherwise noted, the facts cited herein are undisputed.

**PHASE II:**

- Factor 2:  Technical Approach and Demonstrated Functionality/Capability
- Factor 3:  Task Orders
- Factor 4:  Cost/Price

AR Tab 22 at 670.  In addition, the Solicitation provides that, when combined, the non-price evaluation factors are "significantly more important than price" and that the IDMS Contract will be awarded on a best value, trade-off basis.  *Id.*

With regards to the evaluation of proposals, the Solicitation provides that, during Phase I, the agency will evaluate each offeror's relevant experience and past performance to determine each offeror's perceived ability to successfully perform the Solicitation's requirements.  *Id.* at 672.  The Solicitation also provides that each offeror will receive a relevant experience rating of either, "very relevant," "relevant," "somewhat relevant" or "not relevant."  AR Tab 14 at 341.

In addition, the Solicitation requires that each offeror will receive a past performance rating of "substantial confidence," "satisfactory confidence," "limited confidence," "no confidence" or "neutral/unknown confidence."  *Id.* at 341-42.  In this regard, the Solicitation provides that only those offerors who receive the highest combined ratings during Phase I will be considered during Phase II and remain eligible for award.  AR Tab 22 at 674.

The  Solicitation also provides that, during Phase II, each remaining offeror will submit a technical and cost/price proposal that includes, among other things, performance work statements for two sample task orders.  *Id.* at 674-75.  Specifically, the Solicitation requires that the two sample task orders be priced on the basis of "Time and Materials, Labor Hour[,] Firm Fixed Price, or any combination thereof" and that the agency will evaluate cost and price using each proposal's sample task orders.  *Id.* at 587, 677.  The Solicitation also provides that each proposal will be reviewed by, among other entities, a technical evaluation panel ("TEP") that will assess each proposal's strengths, weaknesses, risks and deficiencies and assign each proposal one of the following four ratings in connection with Factors 2 and 3:

| Rating | Definition |
|---|---|
| Superior | Proposal meets all solicitation requirements, demonstrates a good understanding of the requirements and has features that offer significant advantages to the Government.  Advantages/strengths generally outweigh any disadvantages/weaknesses.  Good |

| | |
|---|---|
| | probability of success with very low degree of risk of unsuccessful performance. |
| Acceptable | Proposal meets basic solicitation requirements and demonstrates an adequate understanding of the requirements but does not offer significant advantages to the Government over basic RFP requirements.  Disadvantages/weaknesses are not significant, unless significant advantages are proposed that outweigh significant disadvantages.  Where there were areas of concern, clarifications given by Offeror, were acceptable.  Reasonable probability of success with low degree of risk of unsuccessful performance. |
| Marginal | Proposal does not clearly meet all requirements, nor does it demonstrate an adequate approach and understanding of the requirements.  The proposal has one or more weaknesses which may require correction.  Some areas of concern may not have been fully addressed by Offeror, leaving some ambiguities.  Risk of unsuccessful performance is moderate. |
| Unacceptable | Proposal does not meet requirements and contains one or more significant deficiencies.  Risk of unsuccessful performance is high.  Proposal is unawardable without being rewritten. |

*Id.* at 675-76.  In this regard, the Solicitation provides that the ratings for Factors 2 and 3 will be combined with the ratings for Factor 1 into a single, overall technical rating.  *Id.* at 677.  Lastly, the Solicitation provides that the contracting officer will perform a trade-off analysis to determine which proposal offers the best value to the government and whether a price premium is justified.  *Id.* at 670.

### 2.    The Evaluation Process

The State Department received timely Phase I proposals from several offerors, including XTec and Guidehouse.  *See* AR Tabs 5 and 6; AR Tab 14 at 346.  The agency rated each offeror's relevant experience and past performance as follows:

| Offeror | Performance Confidence Ratings |
|---|---|
| ICF, Inc. | Relevant/Substantial Confidence |
| Perspecta | Very Relevant/Substantial Confidence |
| Guidehouse | Somewhat Relevant/Substantial Confidence |
| XTec | Very Relevant/Substantial Confidence |

AR Tab 14 at 343.  Based upon these ratings, all of the offerors advanced to Phase II and submitted technical and cost/price proposals.  *Id.* at 346; *see generally* AR Tabs 23-49.

During Phase II of the evaluation process, the State Department rated each offeror's technical proposal as follows:

| Factor | ICF, Inc. | Perspecta | Guidehouse | XTec |
|---|---|---|---|---|
| Factor 2: Technical Approach and Demonstrated Functionality/Capability | Marginal | Marginal | Superior | Acceptable |
| Factor 3: Task Orders | Marginal | Marginal | Superior | Acceptable |
| Overall Rating | Marginal | Marginal | Superior | Acceptable |

AR Tab 64 at 1800.

Several statements found in Guidehouse's Phase II proposal are relevant to this dispute. First, Guidehouse states in its Phase II proposal that, if "user identity data (biographic and biometric) transferred from the incumbent to [Guidehouse] is not usable or incomplete due to format, structure, quality, or content," Guidehouse "will need to revisit [its] pricing and approach." AR Tab 23 at 722. Guidehouse also states in its proposal that, if "personalized card cryptographic, diversification, or serialization data is incomplete or cannot be provided by the incumbent, then existing cards cannot be managed by [Guidehouse]" and Guidehouse "will need to revisit [its] pricing and approach." *Id.* In addition, Guidehouse states in its proposal that, "[i]f any equipment requirements were missed and identified in the [government's] review of [Guidehouse's Bill of Materials,] Guidehouse may change the material cost requirement and price of [Task Order #1] accordingly." AR Tab 26 at 788.

Guidehouse also represents in its proposal that its IDMS solution "is successfully deployed at 16 Federal agencies, such as the Nuclear Regulatory Commission, the Social Security Administration (SSA), DHS, and US Intelligence Agencies." AR Tab 23 at 695. In this regard, Guidehouse represents that "Team Guidehouse," which includes Guidehouse and its proposed subcontractor for the IDMS Contract, Appian, "performed bulk user and card migrations for organizations of larger size and scale, such as the DHS TWIC program where our team transitioned more than 1 million identities (biographic, biometric, and attribute) and cryptographic data (Gemalto and Idemia/Oberthur) cards to [Guidehouse's IDMS solution]." *Id.* at 696. Lastly, Guidehouse represents that Team Guidehouse participated in the "DHS HSPD-12 transition of 350,000 cards and identities [from] Xtec's AuthenX [IDMS solution] to Centech Security Manager and Radiant Logic." *Id.* at 706.

### 3.   The Price Analysis, Source Selection Decision And Award

After evaluating Factors 1, 2 and 3, the State Department evaluated each offeror's

proposed price for reasonableness and realism. *See generally* AR Tab 51.  The agency determined that Guidehouse and XTec were the only two offerors that proposed realistic prices for their labor rates, subcontractor labor rates, indirect cost rates, material costs and other direct costs, and the cost elements leading to their proposed firm fixed prices. *Id.* at 1722, 1727-28. And so, the agency concluded that the proposal submitted by XTec and Guidehouse "reflect a clear understanding of the requirements and [were] consistent with the unique methods of performance and materials described in [each offeror's] technical proposal."[2] *Id.* at 1728. Because Guidehouse's proposal was both higher-rated and lower-priced than XTec's, the contracting officer did not perform a best value trade-off between the two proposals. *See* AR Tab 64 at 1813, 1821-22.  And so, the State Department awarded the IDMS Contract to Guidehouse on March 18, 2020.  AR Tab 66 at 1825.

### 4.    XTec's GAO Protest And Task Order #1

On March 27, 2020, XTec filed a protest before the Government Accountability Office ("GAO") challenging the State Department's evaluation process and award decision.  Compl. at ¶ 24; AR Tab 76 at 1897.  The GAO denied XTec's protest on July 2, 2020.  *See generally* AR Tab 89

On July 14, 2020, Guidehouse submitted a Time and Materials proposal for Task Order #1 under the IDMS Contract to the State Department.  AR Tab 101 at 2707.  On July 16, 2020, the State Department awarded Task Order #1 to Guidehouse as a Time and Materials task order. AR Tab 99 at 686, 2684, 2686.

XTec commenced this bid protest action on August 27, 2020.  *See* Compl.

---

[2] The State Department rated each offeror's price proposal as follows:

| Offeror | Overall Proposed Price | Realism Determination | Additional Performance Risk |
|---|---|---|---|
| XTec | $49,726,796 | Realistic | No |
| Perspecta | $41,601,892 | Unrealistic | Yes |
| ICF | $60,643,132 | Unknown | Yes |
| Guidehouse | $46,238,736 | Realistic | No |

AR Tab 51 at 1722.

B.      **Procedural Background**

On August 27, 2020, XTec filed the complaint and motions for a temporary restraining order and for a preliminary injunction. *See generally* Compl.; Pl. Mot. for TRO; Pl. Mot. for PI. On the same date, Guidehouse filed an unopposed motion to intervene, which the Court granted on August 31, 2020. *See generally* Def.-Int. Mot. to Intervene; Order, dated August 31, 2020. On August 31, 2020, the Court also entered a Protective Order in this matter. *See generally* Protective Order.

On September 25, 2020, the government filed the administrative record, which it subsequently amended on October 14, 2020, and November 19, 2020. *See generally* AR. On October 9, 2020, the government filed an unopposed motion to remand Count I of the complaint to the State Department for reconsideration, which the Court granted on October 13, 2020. *See generally* Def. Mot. to Remand; Order, dated October 13, 2020.

On October 12, 2020, XTec filed a motion for judgment upon the administrative record. *See generally* Pl. Mot. On October 20, 2020, XTec filed a motion to supplement the administrative record. *See generally* Pl. Mot. to Supp. On November 3, 2020, Guidehouse filed a response and opposition to XTec's motion to supplement the administrative record. *See generally* Def.-Int. Resp. On November 18, 2020, the government filed a response and opposition to XTec's motion to supplement the administrative record. *See generally* Def. Resp. On November 23, 2020, XTec filed a reply brief in support of its motion to supplement the administrative record. *See generally* Pl. Reply.

On October 26, 2020, the government and Guidehouse filed their respective responses and oppositions to XTec's motion for judgment upon the administrative record, partial motions to dismiss XTec's claim regarding the issuance of Task Order #1 for lack of subject-matter jurisdiction and cross-motions for judgment upon the administrative record. *See generally* Def. Mot.; Def.-Int. Mot.; Def.-Int. Mem.

On November 2, 2020, XTec filed a response and opposition to the government's and Guidehouse's respective partial motions to dismiss and cross-motions for judgment upon the administrative record, and a reply in support of its motion for judgment upon the administrative record. *See generally* Pl. Resp. On November 9, 2020, the government and Guidehouse filed their respective reply briefs in support of their motions. *See generally* Def. Reply; Def.-Int.

8

Reply.

On November 30, 2020, XTec filed a motion to voluntarily dismiss Count I of the complaint, which the Court granted on December 4, 2020. *See generally* Pl. Mot. to Dismiss; Order, dated December 4, 2020. On February 18, 2020, the Court held oral arguments on the parties' cross-motions. *See generally* Oral Arg. Tr.

These matters having been fully briefed, the Court addresses the pending motions.

## III.   LEGAL STANDARDS

### A.   Bid Protest Jurisdiction

The Tucker Act grants the United States Court of Federal Claims jurisdiction over bid protests brought by "an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). In bid protest cases, this Court reviews agency actions under the Administrative Procedure Act's ("APA") "arbitrary and capricious" standard. *See* 28 U.S.C. § 1491(b)(4) (adopting the standard of review set forth in the Administrative Procedure Act). And so, under the APA's standard, an award may be set aside if, "'(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)).

The United States Court of Appeals for the Federal Circuit has recognized that:

> When a challenge is brought on the first ground, the test is whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a "heavy burden" of showing that the award decision had no rational basis. When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations.

*Id*. (citations omitted). In addition, when reviewing an agency's procurement decision, the Court should recognize that the agency's decision is entitled to a "presumption of regularity." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *abrogated by Califano v. Sanders*, 430 U.S. 99 (1977). "The [C]ourt should not substitute its judgment for that of a

procuring agency . . . ." *Cincom Sys., Inc. v. United States*, 37 Fed. Cl. 663, 672 (1997).  And so, "[t]he protestor must show, by a preponderance of the evidence, that the agency's actions were either without a reasonable basis or in violation of applicable procurement law." *Info. Tech. & Applics. Corp. v. United States*, 51 Fed. Cl. 340, 346 (2001), *aff'd*, 316 F.3d 1312 (Fed. Cir. 2003) (citation omitted).

The Court's standard of review "is highly deferential." *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000).  As long as there is "'a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion.'" *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C. Cir. 1971)).  But, if "the agency 'entirely fail[s] to consider an important aspect of the problem [or] offer[s] an explanation for its decision that runs counter to the evidence before the agency,'" then the resulting action lacks a rational basis and, therefore, is defined as "arbitrary and capricious." *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

### B.    RCFC 12(b)(1) And FASA

When deciding a motion to dismiss upon the ground that the Court does not possess subject-matter jurisdiction pursuant to RCFC 12(b)(1), this Court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the non-movant's favor. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *see also* RCFC 12(b)(1).  But, plaintiff bears the burden of establishing subject-matter jurisdiction, and plaintiff must do so by a preponderance of the evidence. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988).  And so, should the Court determine that "it lacks jurisdiction over the subject matter, it must dismiss the claim." *Matthews v. United States*, 72 Fed. Cl. 274, 278 (2006) (citations omitted); *see also* RCFC 12(h)(3).

It is well-established that the Court does not possess subject-matter jurisdiction to consider challenges to the issuance of a post-award task order.  Specifically, the Federal Acquisition Streamlining Act ("FASA") provides in pertinent part that:

> (1) A protest is not authorized in connection with the issuance or proposed issuance of a task or delivery order except for—(A) a protest on the ground that the order increases the scope, period, or maximum value of the contract under which the order is issued; or (B) a protest of an order valued in excess of $10,000,000. (2) Notwithstanding section 3556 of title 31, the Comptroller General of the United States shall have exclusive jurisdiction of a protest authorized under paragraph (1)(B).

41 U.S.C. § 4106(f)(1), (2).  And so, FASA generally prohibits a plaintiff from bringing a challenge to the issuance, or proposed issuance, of a task order in this Court.  *Id.*; *see also SRA Int'l, Inc. v. United States*, 766 F.3d 1409, 1413 (Fed. Cir. 2014) (holding that FASA "effectively eliminates all judicial review for protests made in connection with . . . a task order[.]").

### C.      Judgement Upon The Administrative Record

Unlike a summary judgment motion brought pursuant to RCFC 56, "the existence of genuine issues of material fact does not preclude judgment on the administrative record" under RCFC 52.1.  *Tech. Sys., Inc. v. United States*, 98 Fed. Cl. 228, 242 (2011); *see* RCFC 56. Rather, the Court's inquiry is "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record."  *A&D Fire Prot., Inc. v. United States*, 72 Fed. Cl. 126, 131 (2006) (citing *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005)).

### D.      Unstated Evaluation Criteria And Disparate Treatment Claims

The Federal Circuit has held that, to succeed upon an unstated evaluation criteria claim, a protestor must show that:  (1) the agency used a significantly different basis in evaluating its proposals than was disclosed and (2) that the protestor has been prejudiced as a result.  *Banknote Corp. of Am. v. United States*, 56 Fed. Cl. 377, 387 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004). The Federal Circuit has also held that, to succeed in a disparate treatment claim, "a protestor must show that the agency downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals."  *Office Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020).

### E.      Supplementing The Administrative Record

The Federal Circuit held in *Axiom Resource Management, Inc. v. United States*, that the "parties' ability to supplement the administrative record is limited" and that the administrative

record should only be supplemented "if the existing record is insufficient to permit meaningful review consistent with the [Administrative Procedure Act]." 564 F.3d 1374, 1379-81 (Fed. Cir. 2009); *see also Caddell Constr. Co., Inc. v. United States*, 111 Fed. Cl. 49, 93 (2013). The Federal Circuit has also recognized that the Supreme Court held in *Camp v. Pitts* that "'the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.'" *Axiom Res. Mgmt., Inc.*, 564 F.3d at 1379 (quoting *Camp v. Pitts*, 411 U.S. 138, 142 (1973)).

This focus is maintained to prevent courts from using new evidence to "convert the arbitrary and capricious standard into effectively de novo review." *L-3 Commc'ns EOTech, Inc. v. United States*, 87 Fed. Cl. 656, 671 (2009) (internal quotation marks omitted); *see also Murakami v. United States*, 46 Fed. Cl. 731, 735 (2000). And so, this Court has interpreted the Federal Circuit's directive in *Axiom*, within the context of bid protest matters, to mean that supplementation of the administrative record is permitted to correct mistakes and fill gaps, but is not permitted when the documents proffered are unnecessary for an effective review of the government's decision. *L-3 Commc'ns EOTech, Inc.*, 87 Fed. Cl. at 672.

## F.    Injunctive Relief

Lastly, the Tucker Act authorizes this Court to "award any relief that the court considers proper, including . . . injunctive relief" in bid protest matters. 28 U.S.C. § 1491(b)(2); *see* RCFC 65. But, "a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis omitted) (citation omitted); *Intel Corp. v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566, 1568 (Fed. Cir. 1993) (The award of "a preliminary injunction is a drastic and extraordinary remedy that is not to be routinely granted."). In deciding whether to grant emergency injunctive relief, the Federal Circuit has directed that the Court consider: (1) whether the plaintiff is likely to succeed on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the Court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief. *PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004); *see also FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993); *OAO Corp. v. United States,* 49 Fed. Cl. 478, 480 (2001).

In addition, the Federal Circuit has held that "[n]o one factor, taken individually, is necessarily dispositive. . . .  [T]he weakness of the showing regarding one factor may be overborne by the strength of the others." *FMC Corp.*, 3 F.3d at 427.  Conversely, "the absence of an adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned the other factors, to justify the denial" of a motion for a preliminary injunction.  *Id*. And so, the Federal Circuit has held that "a movant is not entitled to a preliminary injunction if he fails to demonstrate a likelihood of success on the merits."  *Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd.*, 357 F.3d 1319, 1325 (Fed. Cir. 2004).

## IV.   LEGAL ANALYSIS

XTec asserts ten challenges to the State Department's evaluation process and award decision for the IDMS Contract, namely that:  (1) the State Department should have rejected Guidehouse's proposal, because Guidehouse transferred substantial risks and costs to the agency in violation of the Solicitation; (2) Guidehouse improperly omitted necessary equipment from its proposal; (3) the State Department issued a post-award task order to Guidehouse that, among other things, violated the terms of the Solicitation and applicable law, provided an unfair competitive advantage to Guidehouse, constituted unequal discussions with offerors, and resulted in a cardinal change to the IDMS Contract; (4) the State Department's price realism analysis is unsupported and does not account for missing items in Guidehouse's proposal; (5) Guidehouse's proposal contains a material misrepresentation regarding its past experience; (6) the State Department improperly declined to assign a significant weakness to Guidehouse's proposal, because of Guidehouse's alleged inability to demonstrate symmetric key support; (7) the State Department improperly awarded a strength to Guidehouse's proposal for having a "widely deployed, standards-compliant system" and treated offerors unequally in evaluating this issue; (8) the State Department failed to assign a weakness to Guidehouse's proposal and failed to assign a strength to XTec's proposal, for operation in degraded network conditions; (9) the State Department unreasonably assigned a significant weakness to XTec's proposal and assigned a superior rating to Guidehouse's proposal, for the use of proprietary products; and (10) the State Department improperly assigned a weakness to XTec's proposal and improperly assigned a strength to Guidehouse's proposal regarding the instructions and tools needed to conduct independent oversight of the proposed IDMS solutions.  Pl. Mot. at 5-32.  And so, XTec

requests, among other things, that the Court set aside the State Department's decision to award the IDMS Contract to Guidehouse.  Compl. at 35.

The government and Guidehouse counter that the State Department conducted a rational evaluation process and that the agency reasonably decided to award the IDMS Contract to Guidehouse, in accordance with the terms of the Solicitation and applicable law.  Def. Mot. at 8-41; Def.-Int. Mem. at 9-42.  The government and Guidehouse have also moved to dismiss XTec's claim regarding the issuance of Task Order #1 for lack of subject-matter jurisdiction.  Def. Mot. at 20-23; Def.-Int. Mot. at 13-19.  And so, the government and Guidehouse request that the Court dismiss XTec's claim challenging Task Order #1 and deny this bid protest.  Def. Mot. at 41; Def.-Int. Mem. at 42.

In addition, XTec has moved to supplement the administrative record in this case with the Declaration of Samantha East.  *See generally* Pl. Mot. to Supp.  Lastly, XTec has also moved for a preliminary injunction and a temporary restraining order to enjoin the State Department from continuing with the performance of the IDMS Contract.  Pl. Mot. for TRO; Pl. Mot. for PI.

For the reasons set forth below, a careful review of the administrative record shows that the Court does not possess subject-matter jurisdiction to consider XTec's claim challenging the issuance of Task Order #1.  XTec also has not shown that supplementing the extensive administrative record in this case is warranted.  In addition, the administrative record makes clear that the State Department's evaluation process and decision to award the IDMS Contract to Guidehouse were reasonable and consistent with the terms of the Solicitation.   And so, the Court: (1) **DENIES** XTec's motion to supplement the administrative record; (2) **GRANTS** the government's and Guidehouse's partial motions to dismiss; (3) **DENIES** XTec's motion for judgment upon the administrative record; (4) **GRANTS** the government's and Guidehouse's respective cross-motions for judgment upon the administrative record; (5) **DENIES** XTec's motions for a temporary restraining order and for a preliminary injunction; and (6) **DISMISSES** the complaint.

### A.    Supplementation Of The Administrative Record Is Not Warranted

As an initial matter, the Court must deny XTec's request to supplement the existing administrative record in this post-award bid protest matter with the Declaration of Samantha East.  *See generally* Pl. Mot. to Supp.  It is well-established that the "focal point" of judicial

review in bid protest matters "should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp. v. Pitts*, 411 U.S. 138, 142 (1973). And so, the administrative record should only be supplemented in this case to correct mistakes and fill gaps, "if the existing record is insufficient to permit meaningful review consistent with the APA." *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009).

XTec argues that supplementing the administrative record with the Declaration of Samantha East is necessary, because this declaration provides evidence that Guidehouse misrepresented its past experience. Pl. Mot. to Supp. at 6-7. But, as the government correctly observes in its opposition to XTec's motion to supplement, the existing administrative record contains ample documentation to assess the nature of Guidehouse's past experience and the agency's evaluation of that information. Def. Resp. at 1; *see also* AR Tab 5 at 265-66; AR Tab 23 at 708, 737-38; AR Tab 123 at 3004-011, 3035-047. And so, the Court **DENIES** XTec's motion to supplement the administrative record.

### B.    The Court May Not Consider XTec's Task Order Claim

The government also persuasively argues that the Court must dismiss XTec's claim regarding the issuance of Task Order #1 after the award of the IDMS Contract for lack of subject-matter jurisdiction. Def. Mot. at 20-23. In this bid protest action, XTec argues, among other things, that the State Department issued Task Order #1 in violation of the terms of the Solicitation for the IDMS Contract. Pl. Mot. at 14-19. It is well-established that the Court generally does not possess subject-matter jurisdiction to consider challenges to the issuance of task orders. Specifically, the Federal Acquisition Streamlining Act provides in pertinent part that:

> (1) A protest is not authorized in connection with the issuance or proposed issuance of a task or delivery order except for—(A) a protest on the ground that the order increases the scope, period, or maximum value of the contract under which the order is issued; or (B) a protest of an order valued in excess of $10,000,000. (2) Notwithstanding section 3556 of title 31, the Comptroller General of the United States shall have exclusive jurisdiction of a protest authorized under paragraph (1)(B).

41 U.S.C. § 4106(f)(1), (2). And so, FASA generally prohibits a plaintiff from bringing a challenge to the issuance, or proposed issuance, of a task order in this Court. *Id.*; *see also SRA*

*Int'l, Inc. v. United States*, 766 F.3d 1409, 1413 (Fed. Cir. 2014) (holding that FASA "effectively eliminates all judicial review for protests made in connection with . . . a task order[.]").

XTec's claim in this case does not fall within the limited exceptions to FASA's jurisdictional bar.  The focus of XTec's claim related to Task Order #1 is that Guidehouse changed the type of pricing for this task order for firm-fixed-price to time and materials.  Pl. Mot. at 14-16.  Because this claim does not involve an increase in the scope, period or maximum value of the underlying IDMS Contract, the Court must dismiss XTec's task order claim.[3]  RCFC 12(b)(1).

### C.    The Remainder Of XTec's Claims Are Unsubstantiated

Turning to the merits of XTec's bid protest claims, a careful review of the administrative record shows that the State Department's evaluation process and decision to award the IDMS Contract to Guidehouse were reasonable and consistent with the terms of the Solicitation.  And so, for the reasons that follow, the Court **DENIES** XTec's motion for judgment upon the administrative record and **GRANTS** the government's and Guidehouse's cross-motions for judgment upon the administrative record.

As a preliminary matter, to the extent that XTec can demonstrate that any of the alleged evaluation errors in this case actually occurred, XTec will have difficulty showing that it has been prejudiced by such errors.  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1353 (Fed. Cir. 2005); *see also Lyon Shipyard Co. v. United States*, 113 Fed. Cl. 347, 354 (2013) (holding that a protestor must show agency action in violation of a procurement regulation and significant prejudice as a result of such error).  The administrative record shows that XTec received a lower overall technical rating of "acceptable" compared to Guidehouse's overall technical rating

---

[3] XTec's reliance upon this Court's decisions in *Fluor Intercontinental, Inc.* and *PAE-Parsons* to overcome FASA's jurisdictional bar is also misplaced.  *See Fluor Intercontinental, Inc. v. United States*, 147 Fed. Cl. 309, 322 (2020) (holding that FASA's jurisdictional bar did not preclude the Court from considering a challenge to a task order that was simultaneously awarded with the underlying IDIQ contract); *PAE-Parsons Global Logistics Services, LLC. v. United States*, 145 Fed. Cl. 194, 199 (2019) (holding that FASA's jurisdictional bar did not preclude the Court from considering a challenge to a task order award that was "inextricably linked" to the IDIQ contract at issue in that matter).  Unlike the task orders at issue in those cases, Task Order #1 was not simultaneously issued with the award of the IDMS Contract.  *Id.*; AR Tab 66 at 1825; AR Tab 99 at 2686.  Notably, the State Department issued Task Order #1 approximately four months after the award of the IDMS Contract.  AR Tab 66 at 1825; AR Tab 99 at 686.

possible of "superior," during the State Department's evaluation process.  AR Tab 64 at 1800 (showing that under Factors 2 and 3, Guidehouse received "superior" ratings and XTec received "acceptable" ratings).  The administrative record also shows that Guidehouse proposed a price that is almost $3 million lower than XTec's proposed price.  AR Tab 51 at 1722.  Given this, the Court has difficulty concluding that, but for the evaluation errors alleged in this case, XTec would have had a substantial chance of being awarded the IDMS Contract.  *Bannum, Inc.*, 404 F.3d at 1353.

Notwithstanding the aforementioned concerns, the administrative record in this case also fails to support XTec's claims that the State Department conducted an irrational evaluation process.

### 1.    Guidehouse Did Not Transfer Substantial Risks And Costs To The State Department

First, XTec's claim that the State Department should have rejected Guidehouse's proposal, because Guidehouse transferred substantial risks and costs to the agency, is not supported by the record evidence.[4]  XTec argues that Guidehouse's price proposal improperly required the State Department to provide Guidehouse with various forms of data—including identity source documents, person unique identifiers, chain of trust, card cryptographic algorithms, card management serialization, PKI user certificates and Cryptographic Management Syntax signing keys.  Pl. Mot. at 5-11; AR Tab 26 at 789-90.  But, XTec's claim is contrary to the terms of the Solicitation, which makes clear that either the State Department or XTec would provide this information to Guidehouse.

In this regard, the Solicitation states that XTec (if not the contract awardee) will share the data that is necessary to perform the IDMS Contract, pursuant to an associate contractor agreement to be executed after contract award.  AR Tab 22 at 655 (stating that XTec "will share information regarding IDMS with the IDMS awardee).  Given this, the record evidence shows

---

[4] The Court observes that XTec is the incumbent provider of IDMS products and services to the State Department.  AR Tab 6 at 272; Oral Arg. Tr. at 42:13-42:17.  And so, it is undisputed that XTec has access to certain data and information necessary to provide the agency's IDMS solution.  AR Tab 6 at 272; Oral Arg. Tr. at 42:17-42:20.

that it was reasonable and appropriate for the State Department and Guidehouse to presume that Guidehouse would receive certain data necessary to perform the IDMS Contract from XTec.[5]

The Court is also not persuaded by XTec's argument that Guidehouse failed to comply with the Solicitation, because it did not account for the risk that XTec may decline to provide this information. Pl. Mot. at 7-9; Pl. Resp. at 8-11. For example, XTec argues that Guidehouse improperly passed on risks to the State Department, because XTec will not be able to provide Guidehouse with certain information needed to manage the PIV cards for certain designated individuals. Pl. Mot. at 8. But, as discussed above, the terms of the Solicitation contemplate that XTec would provide this information to Guidehouse pursuant to an associate contractor agreement. AR Tab 22 at 655. And so, the Court does not agree that Guidehouse's failure to account for this information in its proposal violates the terms of the Solicitation.

The Solicitation also makes clear that Guidehouse was not expected to include PKI certificates in its price proposal, as XTec suggests. Notably, the Solicitation states that the State Department "owns and operates its own independent . . . Certificate Authority (CA)" that the agency uses to issue the PKI certificates. AR Tab 16 at 444. And so, the administrative record makes clear that the State Department rather than Guidehouse would be responsible for the cost of issuing PKI certificates. *Id.*

Lastly, XTec's argument that Guidehouse improperly omitted from its proposal the cost of installing new Physical Access Control Systems ("PACS") readers, or reconfiguring the State Department's existing PACS readers, is also unsubstantiated. Again, the record evidence shows that the State Department will assume the costs associated with the PACS readers, because the agency will transition to asymmetric card readers during the life of the IDMS Contract. *Id.*

Because the record evidence does not substantiate XTec's claim that Guidehouse improperly transferred substantial risks and costs to the State Department in its proposal, the Court must deny XTec's claim.

---

[5] The Solicitation includes technical standards and policies that require the State Department to provide several forms of data to the awardee of the IDMS Contract. AR Tab 16 at 456-59. As the government explains, this data is considered government property. Def. Mot. at 11-13.

### 2. Guidehouse Included All
### Equipment Necessary For Its IDMS Solution

XTec also argues without persuasion that the State Department's decision to award the IDMS Contract to Guidehouse is improper, because Guidehouse omitted certain equipment from its proposal that is necessary to perform the contract. The parties agree that Guidehouse omitted certain equipment needed to perform the IDMS Contract from the performance work statements for its two sample task orders. Pl. Mot. at 12; Def. Mot. at 19. But, a careful review of the administrative record shows that Guidehouse included all of the equipment necessary to perform the IDMS Contract elsewhere in its technical and price proposals. AR Tab 23 at 693-94; AR Tab 26 at 787; AR Tab 27. Given this, the record evidence shows that the State Department reasonably assigned two weaknesses to Guidehouse's proposal for failing to include all necessary equipment in its performance work statements and that the agency also rationally determined that "these weaknesses are significantly outweighed by the advantages associated with the strengths" found elsewhere in Guidehouse's proposal. AR Tab 59 at 1742.

### 3. The State Department Provided
### Sufficient Support For Its Price Realism Analysis

XTec's claim that the State Department's price realism analysis is fatally flawed is similarly not supported by the record evidence. XTec argues that the agency's determination that Guidehouse's price was realistic is contradicted by the fact that Guidehouse omitted necessary equipment from its proposal. Pl. Mot. at 20. XTec also argues that the agency's price realism analysis is flawed, because it does not include any calculations to support the agency's conclusions. *Id.* at 20-21. Again, neither of XTec's arguments find support in the administrative record.

As discussed above, the administrative record shows that Guidehouse did not omit the equipment necessary to perform the IDMS Contract from its proposal, as XTec suggests. AR Tab 23 at 705; AR Tab 26 at 787; AR Tab 27. The record evidence also shows that the State Department conducted a reasonable price realism analysis.

In this regard, XTec correctly observes that the State Department's price realism report does not contain any calculations. But, a careful review of the analysis shows, nonetheless, that the State Department reasonably analyzed each offeror's price proposal in its price realism

19

analysis.  Notably, the price realism report shows that the State Department considered every offeror's proposed labor rates, subcontractor labor rates, indirect cost rates, material costs and other direct costs, and the cost elements leading to its proposed firm fixed prices.  AR Tab 51 at 1727-28.  This report also shows that the State Department determined that Guidehouse's price proposal was "realistic, reflecting a clear understanding of the requirements and consistent with the unique method of performance and materials described in [Guidehouse's] technical proposal."  *Id.*  And so, the administrative record shows that the State Department performed a reasonable price realism analysis and the Court must also deny this claim.

### 4.      Guidehouse's Proposal Did Not Contain A Material Misrepresentation

The Court is also not persuaded by XTec's argument that Guidehouse's proposal contains a material misrepresentation regarding the past experience of Guidehouse and its subcontractor, Appian.  XTec makes two arguments in support of this claim.  XTec argues that, among other things, Guidehouse misrepresents its past experience in its proposal, by stating that Guidehouse and Appian transitioned 350,000 cards and identities from XTec's AuthenX system to other systems.  Pl. Mot. at 21; *see also* AR Tab 23 at 706 (stating that Team Guidehouse transitioned 350,000 cards and identities from XTec's AuthenX system to Centech's Security Manager system and Radiant's Logic system).  But, again, XTec's argument lacks support in the administrative record.

The record evidence shows that Guidehouse's proposal states that Appian helped to develop the "transition plan, strategy, data model, operations model, tools and systems to facilitate [the] transition from the XTec AuthenX IDMS/CMS [system] to a Commercial off the Shelf software environment owned by [the United States Department of Homeland Security] and managed by federal and contract resources."  AR Tab 5 at 265.  The record evidence also shows that Guidehouse states in its proposal that "Appian led the development of [DHS's] Enterprise ICAM Architecture and Roadmap which informed the establishment of several Enterprise services," including the Trusted Identity Exchange from Radiant Logic.  *Id.* at 265-66.

The aforementioned statements about the prior experiences of Appian are not misleading. In fact, these statements are confirmed in the resume of Siegfried Young, an individual who is affiliated with Appian and will serve as the technical lead for Guidehouse in performing the

IDMS Contract.  AR Tab 23 at 737 (stating that Mr. Young "[l]ed the re-architecture of the DHS IDMS and CMS (XTec AuthenX), and transition of person, card and crypto data to a Government Owned Database.").  Given this, the Court does not read Guidehouse's proposal to be misleading regarding the prior experience of either Guidehouse or Appian.[6]

### 5.    The Agency Reasonably Evaluated Symmetric Key Access

XTec's disparate treatment claim related to the State Department's evaluation of symmetric key access during the operational capability demonstration ("OCD") phase of the procurement is also unsubstantiated.  XTec argues that the State Department treated Guidehouse and another offeror, Perspecta, disparately, because the agency did not assign a weakness to Guidehouse's proposal for allegedly failing to demonstrate symmetric key access capabilities, but did assign a weakness to Perspecta's proposal for failing to do so.  Pl. Mot. at 24-25; *see also CW Gov't Travel, Inc. v. United States*, 110 Fed. Cl. 462, 490 (2013) (holding that federal agencies must "evaluat[e] proposals evenhandedly against common requirements.").  A careful review of the two offerors' respective proposals, and the State Department's technical evaluation, shows, however, that Guidehouse and Perspecta did not submit "substantively indistinguishable" proposals with regards to symmetric key access.  *See Office Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020) (holding that "[a]n agency is under no obligation to assign dissimilar proposals the same evaluation rating.").

Notably, the agency's evaluation of Perspecta's proposal observes that "neither in the OCD nor in the technical proposal does [Perspecta] present its approach for [supporting the development of a symmetric key solution] or the specifics of its relationship with [the provider of the proposed key card solution]."  *See* AR Tab 61 at 1761.  By comparison, the record evidence shows that Guidehouse explained its approach to putting symmetric keys on its key cards and that Guidehouse also demonstrates the method for injecting keys onto its key cards,

---

[6] To the extent that Guidehouse's statements about the prior experience of Appian could be viewed as misleading with respect to the use of PIV cards, the record evidence also makes clear that any misrepresentation in this regard was not material to the State Department's award decision.  The administrative record shows that the State Department understood that Appian did not have prior experience creating PIV cards, or re-using PIV cards.  AR Tab 123 at 3007-08 (noting that Appian previously transitioned the identity and credential data contained within XTec's AuthenX system to a commercial-off-the-shelf solution).

during the OCD.  *See* AR Tab 97, M2U00043 at 1:24-1:32, *see* AR Tab 97, M2U00044 at 0:00-10:45; *see also* AR Tab 23 at 699 (explaining that Guidehouse would use Global Platform, a COTS product that would require a "small enhancement for key rotation according to DoS-specific needs.").  And so the record evidence shows that Guidehouse provided its plan for providing symmetric key capabilities and its proposed method for doing so, while Perspecta did not.[7]

Because XTec has not shown that the proposals submitted by Guidehouse and Perspecta were "substantially indistinguishable" with regards to symmetric key access, the Court must deny XTec's disparate treatment claim.  *Office Design Grp.*, 951 F.3d at 1372.

### 6.    The Agency Reasonably Awarded A Strength To Guidehouse For Wide Deployment

The record evidence similarly does not substantiate XTec's argument that the State Department irrationally assigned a strength to Guidehouse for proposing a "sound, feasible, compliant IDMS solution that has been successfully deployed to more than 90 federal, US[] intelligence, industry and international governments."  Pl. Mot. at 26 (quoting AR Tab 59 at 1734).  While XTec correctly observes that Guidehouse has not previously deployed the *exact* IDMS solution that it proposed for the procurement at issue, the record evidence makes clear that the State Department awarded the strength at issue for Guidehouse's reliance on the Intercede MyID product, not the prior implementation of the exact solution proposed in Guidehouse's proposal.  *See* AR Tab 59 at 1737 ("While [Guidehouse] identifies where many of [the proposed technologies] have been deployed in the past, [Guidehouse] does not indicate that it has implemented this exact solution successfully elsewhere.").  In this regard, the record evidence

---

[7] XTec also argues without persuasion that the State Department waived the requirement to demonstrate symmetric key capabilities, because the Solicitation requires that offerors demonstrate symmetric key access capabilities during the OCD and that Guidehouse failed to do so.  Pl. Mot. at 24.  The agency has discretion in determining how offerors demonstrate such capabilities and the record evidence does not show that the State Department abused that discretion in this case.  *See* AR Tab 22 at 662 (explaining the scope of the OCD); AR Tab 59 at 1737 ("Overall, the TEP determined that [Guidehouse's] Technical Approach and Demonstrated Functionality/Capability meet all solicitation requirements . . . .").

shows that Guidehouse highlights its reliance on the MyID product in its technical proposal.[8] AR Tab 23 at 691-92.  And so, the record evidence shows that the State Department reasonably assigned a strength for Guidehouse's reliance on the MyID product, "because it reduces the risk of unsuccessful deployment."  AR Tab 59 at 1734.

### 7.    The Agency Reasonably Evaluated Operation In Degraded Network Conditions

The Court must also reject XTec's disparate treatment claim involving the State Department's evaluation of operation in degraded network conditions.  XTec argues that the State Department treated Guidehouse and XTec disparately with regards to the evaluation of operation in degraded network conditions, because the agency assigned a weakness to XTec's proposal for failing to propose a solution that operates in degraded network conditions, but the agency did not similarly assign a weakness to Guidehouse's proposal for also failing to do so.[9] Pl. Mot. at 27-28.  But again, XTec has not shown that the two offerors' proposals are "substantially indistinguishable" with regards to operations in degraded network conditions. *Office Design Grp.*, 951 F.3d at 1372.

The record evidence shows that Guidehouse's proposal addressed operation in degraded network conditions by explaining "[n]etwork limitations, such as degraded environments and varying power, can be accommodated through appropriate timeout configuration settings in MyID."  AR Tab 23 at 696.  By comparison, the record evidence shows that XTec's technical proposal does not address the capabilities of its proposed solution to operate in degraded network conditions.  *See* AR Tab 28 at 818-61.  And so, XTec's disparate treatment claim is unsubstantiated.

---

[8] The administrative record also makes clear that the State Department assigned a risk to Guidehouse's proposal because Guidehouse "does not indicate that it has implemented this exact solution successfully elsewhere."  AR Tab 59 at 1737 (citing AR Tab 23 at 705).

[9] The Solicitation addresses degraded network conditions in technical objective B.1 and requires that contractors "[p]rovide a secure, scalable role-based solution that operates in both normal and degraded network conditions with varying power characteristics . . . , quality, and data traffic capacity environments.  AR Tab 16 at 447-48.  The Solicitation also specifies the capabilities that each offeror must demonstrate during the OCD and make clear that that operation in degraded network conditions is not one of the enumerated capabilities to be demonstrated during the OCD.  *See* AR Tab 22 at 662.

XTec's argument that the State Department improperly assigned a weakness to its proposal for failing to address operation in degraded network conditions is equally unavailing. XTec argues that the weakness at issue is unwarranted, because XTec demonstrated this capability during the OCD phase of the procurement.  Pl. Mot. at 28 (citing AR Tab 94, File M2U00028.MPG at 13:23-16:52 minutes).  But, as the government persuasively argues, XTec's argument lacks merit, because the Solicitation does not permit XTec to demonstrate operation in degraded network conditions during the OCD.  Def. Mot. at 35-36; AR Tab 22 at 662.  And so, the record evidence shows that the State Department reasonably assigned the weakness at issue to XTec's proposal.

### 8.    The Agency Did Not Treat XTec And Guidehouse Disparately Regarding Reliance On Proprietary Products

The record evidence also shows that the State Department did not treat XTec and Guidehouse disparately during the agency's evaluation of the offerors' reliance on proprietary products.  XTec contends that the State Department irrationally assigned a weakness to its proposal for relying on proprietary products for its proposed solution, while declining to also assign a weakness to Guidehouse's proposal for also doing so. Pl. Mot. at 29-30.  XTec's claim is unsubstantiated by the record evidence.

The record evidence shows that XTec's technical proposal provides that five of the 14 components for XTec's solution are proprietary sole source components.  AR Tab 28 at 820.  By comparison, the record evidence shows that Guidehouse's proposal states that "[n]one of the components of Team Guidehouse's solution are sole source."  AR Tab 23 at 705.  And so, the State Department understandably assigned a strength to Guidehouse's proposal, because Guidehouse's proposal "requires no sole source products."  *See* AR Tab 59 at 1734.

Because the record evidence makes clear that there were significant distinctions between the proposals submitted by Guidehouse and XTec with regards to proprietary products, the State Department reasonably rated the two offerors' proposals with regards to reliance on proprietary products.

24

9.    **The Agency Reasonably Downgraded XTec's**
      **Proposal For Not Providing Operational Instructions And Tools**

XTec's final claim—that the State Department improperly assigned a weakness to its proposal, and a strength to Guidehouse's proposal, based upon an alleged unstated requirement to provide "operational instructions and tools"—is also unavailing. Pl. Mot. at 31 (citing AR Tab 60 at 1747). XTec argues that the agency irrationally assigned a weakness to its proposal for failing to provide operational instructions and tools that would allow the State Department to assess the performance of the IDMS system, because the Solicitation does not require that offerors provide this information. *Id.* But, the record evidence shows that sections E.2 and E.3 of the Solicitation's quality assurance surveillance plan and methods of surveillance provides that "[t]he Government will perform those quality assurance procedures that may be necessary to verify that performance is in accordance with the terms of the contract and its task orders" and that "[t]he Government may use a variety of surveillance methods to evaluate the Contractor's performance." AR Tab 22 at 593. Given this, the Court agrees with the government that XTec was on notice that the government would assess operational instructions and tools to allow the agency to evaluate the performance of the IDMS system during the evaluation process. *See Banknote Corp. of Am., Inc. v. United States*, 56 Fed. Cl. 377, 387 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004) (quoting *Analytical & Research Tech., Inc. v. United States*, 39 Fed. Cl. 34, 45 (1997)) ("[A] solicitation need not identify each element to be considered by the agency during the course of the evaluation where such element is intrinsic to the stated factors."). And so, XTec's unstated evaluation claim is unsubstantiated.

The record evidence also shows that the State Department reasonably awarded a strength to Guidehouse's proposal for providing "operational instructions and tools" so that the agency could conduct such independent oversight. The State Department assigned this strength because, Guidehouse "provides robust solutions and tools for proactive performance monitoring and auditing." AR Tab 59 at 1736 (citing AR Tab 23 at 692, 700). Given this, XTec has not shown that the State Department employed an unstated evaluation criteria, or that the agency treated offerors disparately, during the evaluation of operational instructions and tools.

###### D.     XTec Is Not Entitled To Injunctive Relief

As a final matter, XTec is not entitled to the injunctive relief that it seeks in this case. XTec seeks to enjoin the State Department from continuing with the performance of the IDMS Contract.  *See generally* Pl. Mot. for TRO; Pl. Mot. for PI.  But, a plaintiff who cannot demonstrate success upon the merits cannot prevail upon a motion for such emergency injunctive relief.  *Nat'l Steel Car, Ltd. v. Canadian Pacific Ry., Ltd.*, 357 F.3d 1319, 1325 (Fed. Cir. 2004) ("[A] movant is not entitled to a preliminary injunction if he fails to demonstrate a likelihood of success on the merits.").  Because XTec has not succeeded upon the merits of any of its bid protest claims, the Court **DENIES** XTec's motions for a temporary restraining order and for a preliminary injunction.

### V.     CONCLUSION

In sum, XTec has not shown that supplementing the existing administrative record is warranted in this case.  A careful review of the administrative record also shows that the Court does not possess subject-matter jurisdiction to consider XTec's claim challenging the issuance of Task Order #1.  In addition, the administrative record shows that the State Department's evaluation process and decision to award the IDMS Contract to Guidehouse were reasonable and consistent with the terms of the Solicitation.

And so, for the foregoing reasons, the Court:

1.  **DENIES** XTec's motion to supplement the administrative record;

2.  **GRANTS** the government's and Guidehouse's partial motions to dismiss;

3.  **DENIES** XTec's motion for judgment upon the administrative record;

4.  **GRANTS** the government's and Guidehouse's respective cross-motions for judgment upon the administrative record;

5.  **DENIES** XTec's motions for a temporary restraining order and for a preliminary injunction; and

6.  **DISMISSES** the complaint.

The Clerk shall enter judgment accordingly.

Each party to bear its own costs.

Some of the information contained in this Memorandum Opinion and Order may be considered protected information subject to the Protective Order entered in this matter on August 31, 2020.  This Memorandum Opinion and Order shall therefore be filed **UNDER SEAL**.  The parties shall review the Memorandum Opinion and Order to determine whether, in their view, any information should be redacted in accordance with the terms of the Protective Order prior to publication.  The parties shall **FILE** a joint status report identifying the information, if any, that they contend should be redacted, together with an explanation of the basis for each proposed redaction on or before **April 1, 2021**.

**IT IS SO ORDERED.**

s/ Lydia Kay Griggsby
LYDIA KAY GRIGGSBY
Judge

27